UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

STEPAN BRUGER, DMYTRO BRUGER,  )
             Plaintiffs,  )
                       )
v.  )
                       )
OLERO, INC, EMB GROUP, INC.,  )
OLEG ROMANYUK, EUGENY MINOCHKIN  )
                       ) Civil Action 19-CV-02277
     Defendants.  ) Honorable Judge Joan Lefkow
                       )

## <u>AMENDED CLASS ACTION COMPLAINT</u>

Julia Bikbova
**Bikbova Law Offices, P.C.**
666 Dundee Road, Suite 1604
Northbrook, IL 60062
(847) 730-1800
<u>julia@bikbovalaw.com</u>
ARDC 6291400

*Attorney for Plaintiffs*

1

I.     NATURE OF THE CASE………………………………………………p.3

II.    PARTIES…………………………...…………………………………p.4

III.   JURISDICTION AND VENUE…………………………………………p.6

IV.  RELEVANT STATUTES AND REGULATIONS……………………..…p.6

      a.  Illinois Wage Payment and Collections Act

V.    PROCEDURAL HISTORY……………………………………………..p.8

VI.  STATEMENT OF FACTS……………………………………………p.10

VII. CLASS ALLEGATIONS………………………………………………p.25

VIII. COUNT I………………………………………………………...p.32

IX.  COUNT II………………………………………………………p.33

X.    COUNT III………………………………………………………p.37

XI.  COUNT IV………………………………………………………p.41

XII.  COUNT V………………………………………………………p.46

XIII. COUNT VI………………………………………………………p.49

XIV. COUNT VII………………………………………………………...p.52

XV.  COUNT VIII………………………………………………………p.54

XVI. COUNT IX………………………………………………………p.56

XVII. PRAYER FOR RELIEF……………………………………………p.57

Plaintiffs, Stepan Bruger and Dmytro Bruger, individually and on behalf of all other similarly situated current and former employees, by their attorneys, bring their claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, The Illinois Wage Payment and Collection Act, ("IWPCA"), 820 ILCS § 115/1, § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10, § 115/13 and § 115/14 and Illinois common law against Olero, Inc., EMB Group, Inc, Oleg Romanyuk, and Eugeny Minochkin, (collectively referred to as "Defendants"), and allege, upon personal belief as to themselves and their own acts, and as for all other matters upon information and belief, and based upon the investigation made by their counsel, as follows:

## I. NATURE OF THE CASE

1. Plaintiffs worked as truck drivers for Defendant Companies Olero Inc. and EMB Group, Inc, which are owned by Oleg Romanyuk and Eugeny Minochkin. Throughout their employment, they were misclassified as independent contractors, and consistently underpaid. Defendants made deductions from Stepan Bruger and Dmytro Bruger's paychecks, which they did not consent to and were not alerted to beforehand.

2. By doing so, Defendant Companies- and the Individual Defendants who controlled them and directed their policies of misclassification of drivers and deductions- violated multiple provisions of the Illinois Wage Payment and Collections Act, 820 ILCS § 115/.

3. Similarly, Defendant Companies and Individual Defendants committed several common law violations, namely, fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, civil conspiracy to commit IWPCA violations, civil conspiracy to commit fraud in the inducement, fraudulent misrepresentation, and fraudulent concealment.

4. Plaintiffs also seek equitable relief of accounting, declaratory judgment, and restitution pursuant to their unjust enrichment claim.

5. Plaintiffs Stepan Bruger and Dmytro Bruger are bringing this action on a class basis, on

behalf of all similarly situated drivers who worked or work at Defendant Companies or any related companies. The violations experienced by Stepan Bruger and Dmytro Bruger were not discrete occurrences, but constituted a business model for Olero Inc. and EMB Group Inc. The vast majority of truck drivers who worked or work for said companies were or are misclassified, underpaid, and subjected to illicit deductions.

## II.     PARTIES

6. Plaintiff Stepan Bruger is a resident of Illinois and worked as a per driven mile paid non-exempt employee for Defendants in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

7. Plaintiff Dmytro Bruger is a resident of Illinois and worked as a per driven mile paid non-exempt employee for Defendants in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

8. Plaintiffs bring this case on behalf of themselves and others who currently work and who worked as drivers for the Defendants in the State of Illinois at any time during the relevant statute of limitations preceding the filing of the original complaint (hereinafter "Violation Period").

9. At all times relevant hereto, Defendant Olero, Inc. ("Olero") has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. Its principal place of business is 8770 W. Bryn Mawr, Suite 1300, Chicago, IL 60631. Defendant Olero Inc., at all relevant times has been an "employer" of Plaintiffs and other similarly situated truck drivers- employees of Defendant within the meaning of the IWPCA, 820 ILCS § 115/2.

4

10. At all times relevant hereto, EMB Group, Inc., ("EMB") has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. Its principal place of business is 8770 W. Bryn Mawr, Suite 1300, Chicago, IL 60631. Defendant EMB Group, Inc., at all relevant times has been an "employer" of Plaintiffs and other similarly situated truck drivers-employees of Defendant within the meaning of the IWPCA, 820 ILCS § 115/2.

11. Defendant Oleg Romanyuk ("Romanyuk") is a resident of State of Illinois, and on information and belief, is the sole shareholder of Olero, Inc., and has been its incorporator, founder, registered agent, President and officer from its inception through present time. Defendant Romanyuk was and is Olero's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Romanyuk caused or otherwise knowingly permitted Olero to violate the provisions of IWPCA. As such, at all relevant times Defendant Romanyuk has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

12. Defendant Eugeny Minochkin ("Minochkin") is a resident of State of Illinois, and on information and belief, is the sole shareholder of EMB, and has been its incorporator, founder, registered agent, President and officer from its inception through present time. Defendant Minochkin was and is EMB's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Minochkin caused or otherwise knowingly permitted EMB to violate the provisions of

5

IWPCA. As such, at all relevant times Defendant Minochkin has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

13. Defendants Olero and EMB are related entities, which are operated by their executives, Defendants Minochkin and Romanyuk. These two companies share the same yard and company trucks, and some drivers, as in the case of Plaintiffs, were employees of one company but hauled loads for the other. Some drivers, as in the case of Plaintiffs, drove trucks belonging to one company, but were compensated by the other.

### III. JURISDICTION AND VENUE

14. This court has personal jurisdiction over Plaintiffs and the class they seek to represent because they are citizens of the State of Illinois and/or work or worked in the State of Illinois.

15. This Court has personal jurisdiction over Defendants because the Defendants do business in the State of Illinois and their conduct in the State of Illinois underlies all claims in this suit. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as this matter is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which some members of a class of plaintiffs are citizens of a State different from any defendant.

16. Venue is proper in this District pursuant to 28 U.S.C§ 1391(b)(2) because a substantial part of the events or omissions which gave rise to IWPCA violations occurred in the Northern District of Illinois.

### IV. RELEVANT STATUTES AND REGULATIONS

17. The Illinois Wage Payment and Collections Act ((820 ILCS 115/) protects Illinois workers from misclassification, underpayment of wages and compensation, unauthorized

deductions, and untimely payment of earned compensation. Just as other Illinois wage laws, the IWPCA is a public interest law.

18. Under Section 2 of the IWPCA, "For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." (820 ILCS 115/2).

19. Under Section 3 of the IWPCA, "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." (820 ILCS 115/3).

20. Under Section 4 of the IWPCA, "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned." (820 ILCS 115/4).

21. Under Section 5 of the IWPCA, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." (820 ILCS 115/5).

22. Under Section 9 of the IWPCA, "Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by a municipality with a population of 500,000 or

7

more . . . or (6) made by a housing authority in a municipality with a population of 500,000 or more…" (820 ILCS 115/9).

23. Under Section 10 of the IWPCA, "Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment. Whenever possible, such notification shall be in writing and shall be acknowledged by both parties. Employers shall also notify employees of any changes in the arrangements, specified above, prior to the time of change." (820 ILCS 115/10).

24. Under Section 13 of the IWPCA, "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." (820 ILCS 115/13).

25. Under Section 14(a) of the IWPCA, "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

## V. PROCEDURAL HISTORY

26. The instant matter was instituted via a Class Action Complaint, filed in the Circuit Court of Cook County, Illinois, Chancery Division, on June 5, 2018, with counts for violations of the IWPCA, common law fraud, civil conspiracy, declaratory judgment, accounting, and unjust enrichment.

27. On July 13, 2018, Defendants filed a motion for extension of time to respond or otherwise

plead.

28. On September 14, 2018, Defendants moved for a substitution of judge. The matter was transferred to Judge Sophia Hall on September 24, 2018.

29. On September 14, 2018, Defendants filed an answer to Count I of the Complaint (violation of the IWPCA) and a Motion to Dismiss pursuant to Rule 2-619.1 of the Illinois Code of Civil Procedure, seeking to dismiss Plaintiffs' Count VI for unjust enrichment, Count V for accounting, Count II fraud, and Count III for civil conspiracy pursuant to Rule 2-615 of the Illinois Code of Civil Procedure, and Count IV for declaratory judgment, Count VI for unjust enrichment, Count II for fraud, and Count III for civil conspiracy pursuant to Rule 2-619 of the Illinois Code of Civil Procedure.

30. On November 20, 2018, the Court heard oral arguments on Defendants' Motion to Dismiss and continued the hearing to December 10, 2018. On that date, Judge Hall denied the Motion to Dismiss Count II for fraud, Count III for conspiracy, and Count VI for unjust enrichment under Rule 2-619 of the Illinois Code of Civil Procedure, but granted the involuntary dismissal of Count II for fraud, Count III for civil conspiracy, Count V for accounting, and Count VI for unjust enrichment pursuant to Rule 2-615, and granted the dismissal of Count IV for declaratory judgment under Rule 2-619. The dismissal of the afore-stated counts was granted without prejudice.

31. On January 9, 2019, Plaintiffs filed a Motion to Reconsider, which was fully briefed. Said motion was denied on March 6, 2019.

32. Plaintiffs were granted leave to file an Amended Complaint. Judge Hall requested that Plaintiffs plead fraud in the inducement, fraudulent misrepresentation, and fraudulent concealment as separate counts, and also requested that Plaintiffs plead conspiracy to commit IWPCA violations and conspiracy to commit fraud as separate counts.

33. On March 14, 2019 Plaintiffs filed their Amended Complaint.

34. On April 3, 2019, Defendants filed a Notice of Removal to this court. On April 10, 2019, Defendants filed a Motion to Dismiss all counts of the Amended Complaint. The parties appeared before this court on April 24, 2019, and this court granted the Plaintiffs leave to amend their complaint, previously filed with the state court.

## VI. STATEMENT OF FACTS

Plaintiff Stepan Bruger's employment

35. Stepan Bruger learned about the truck driver position at Defendant companies from the "Chas I Podii" Ukrainian-language newspaper, distributed in Chicago, at the beginning of October, 2016. He contacted the Defendants' company by calling the listed phone number and was invited for an interview.

36. He drove to Chicago, Illinois, to meet with Olero and EMB's safety manager and then with Oleg Romanyuk for an interview. The entire interview lasted about 30 minutes. Defendant Romanyuk asked Mr. Bruger a few questions about his experience as a truck driver and Mr. Bruger answered.

37. Defendant Romanyuk told Mr. Bruger that he would be driving a truck provided by the company. Mr. Bruger knew that ahead of time before he came for the interview because when he called to inquire about the job, the first question he asked was whether he would need his own equipment. The answer he received was that he would be "driving the company truck".

38. Defendant Romanyuk also told Mr. Bruger that he could only work for Defendant Company and no other trucking company, and that this would be a full time commitment on his part. Defendant Romanyuk said that he would pay Mr. Bruger $0.50 for each mile driven, including "empty miles", and said that if he agreed, he could have the job.

39. Mr. Bruger accepted the offer. In fact, this agreement's terms are reflected in the very first paycheck and settlement report that Mr. Bruger received, under which he was paid 50 cents per mile for the work he performed but was not paid for all the work he performed.

40. Mr. Bruger was given some papers to sign. Mr. Bruger began reviewing the papers but, due to his limited English language skills, could not understand most of what was in that paperwork. The stack of papers was at least about twenty pages.

41. Mr. Bruger believed that he and Defendant Romanyuk had a mutual understanding that he would drive the truck as a full-time employee of Olero and Olero would pay him for all miles driven. Mr. Bruger had no reason to expect that Olero would pay for fewer miles than he actually drove and that it would make deductions from his pay on a regular basis for various dubious "charges" or "violations".

42. Mr. Bruger drove a company truck at all times while working for Olero. He did not lease the truck from the company. Olero provided all work assignments for him and Mr. Bruger did not have any customers of his own nor was he allowed to have them. Olero set the prices charged for all deliveries, billed its customers for work performed and collected the receivables.

43. Defendants did not pay for all of the miles which Mr. Bruger drove.

44. Mr. Bruger, like all other drivers, was required to complete Log Books and submit them upon return to the office whenever he was in Illinois. Mr. Bruger insisted on filling out his own Log Books but Defendants would alter the Log Books each and every time. Mr. Bruger believes that this was done for two reasons.

45. First, Defendants made their drivers, Mr. Bruger included, spend more time on the road while driving a truck than the federal law allows because Defendants wanted to make as much money as possible while ignoring the stringent constraints on the amount of time a truck

11

driver can spend on the road while driving.

46. Second, Defendants paid Mr. Bruger, as well as all other drivers (as Mr. Bruger is aware from personal conversations with other members of the proposed class), only for the miles that were reflected on the altered Log Books after Defendants would reduce the number of miles in Log Books. Defendants did not want to pay and did not pay for actual amount of miles Mr. Bruger and other drivers, members of the proposed class, drove while working for Defendants.

47. For example, if Mr. Bruger drove from Chicago to New York, he would reflect the two points of departure and arrival in his Log Book for a given week and he would do so precisely based on the starting point address and the end point of drop off and based on the precise route per maps/navigation he was following, and Mr. Bruger's personal records. The distance would roughly be 1000 miles. However, Defendants would then change their books to reflect a lower number, such as 900 miles. Defendants would then pay him only for that reduced number of miles, and not for the actual distance that he drove, despite the maps/navigation clearly indicating how many miles the commute actually was.

48. In this way, Defendants both managed to subvert federal law by having their drivers exceed the maximum allowed time on the road, and to underpay their drivers, by not compensating them for all miles driven.

49. On average, Mr. Bruger would drive on average about 13,000 miles per month. At the very least, he was underpaid for 10% of the actual distance he drove while working for Defendants, which amounts to approximately $650 of unpaid compensation per month. Mr. Stepan Bruger worked for Defendants for 11 months; hence, he was uncompensated approximately $7,150.00 for the miles he has actually driven for Defendants.

50. During his hiring interview, Defendants never told Mr. Bruger that they would pay for fewer

12

miles than he would actually drive. In fact, he was promised that he would be paid for all miles driven. Mr. Bruger would never have agreed to take the position if he had known of Defendants' plan to underpay him.

51. Not paying for every mile driven was not the only way in which Defendants underpaid Plaintiff. The first time that the Defendants deducted from his pay $25.00 as a "charge" for completing the Log Books, Mr. Bruger objected, stating that should this ever happen again, he would refuse continuing working for Defendants. Mr. Bruger was never told about this charge when he was being offered this job. Other deductions that were made from Mr. Bruger's paycheck include the following examples:

    a. $49.95 charge for "lack of cover to bulb on the trailer".

    b. $1640.00 for the last few loads he hauled before quitting, totaling 3280.00 miles.

    c. $80.00 for "straps".

    d. $172.00 DOT violation for "overweight".

    e. $2000.00 for "trailer damage".

    f. $3.73 for "truck's expenses."

    g. $65.50 for "truck wash".

    h. $2.65 for "truck's expenses".

    i. $1,000.00 for "truck's bumper repair".

    j. $2,500.00 for "truck repair".

52. The total amount of deductions was $7,538.83. Mr. Bruger was never told when offered this job that such expenses or charges would be deducted from his pay.

53. Over the course of Mr. Bruger's employment, which lasted for 11 months, Defendants did not pay approximately $16,188.83 for work he performed and compensation he earned because of deducting various charges from his pay and paying for fewer miles than he

actually drove.

54. Since the time when the statutory 2% interest per IWPCA began to accrue, the interest on the unpaid said compensation to date is at least $8,348.04, and this figure continues to rise each month subsequent to the filing of this Complaint.

55. Defendants also deducted and withheld from Mr. Bruger's earned compensation $1,500.00 in so-called "escrow". This "escrow deposit" was only repaid to Mr Bruger on or about October 21, 2017, 12 months after it was originally withheld in October of 2016. Over the 12 months it was withheld, Defendants incurred $402.36 in statutory interest under the IWPCA.

56. The total amount of damages that Mr. Stepan Bruger claims in this Complaint is approximately $24,939.23 not including attorney's fees and costs. Mr. Stepan Bruger worked for Defendants for 11 months.

<u>Plaintiff Dmytro Bruger's Employment with Defendants</u>

57. Dmytro Bruger worked for Defendants from February 6, 2017 to October 20, 2017. When he learned about Olero hiring from his brother, Plaintiff Stepan Bruger, he called the phone number he was given and was invited for an interview.

58. He drove to Chicago, Illinois, to meet with Oleg Romanyuk and Eugeny Minochkin for an interview. The entire interview lasted about 30 minutes. Defendant Romanyuk asked Mr. Bruger a few questions about his experience as a truck driver and Mr. Bruger described his previous experience in a couple of sentences.

59. Defendant Romanyuk told Mr. Bruger that he would be driving a truck provided by the company.

60. Defendant Romanyuk also told Mr. Bruger that he can work for his company only and that this would be a full time commitment on his part. Mr. Bruger would not be allowed to work

for any other companies. Defendant Romanyuk said that he would pay $0.50 for each mile driven and said if Mr. Bruger agreed, he could have the job. Mr. Bruger accepted the offer.

61. Immediately thereafter Defendant Minochkin came to the room and presented Mr. Bruger with documents to sign. Mr. Bruger began reviewing them but due to his limited English language reading skills could not understand the papers. The stack of papers Defendant Minochkin presented contained at least twenty pages.

62. Mr. Bruger had no reason to believe that the papers would have different terms than what Defendants Romanyuk and Minochkin promised him. Mr. Bruger believed that they had a mutual understanding and assent that he would drive the truck as a full-time commitment to Olero and Olero would pay him as employee for all miles he would drive.

63. Mr. Bruger and Defendants formed an employment agreement whereby Defendants agreed to pay Mr. Bruger 50 cents per mile driven for all work performed as a truck driver, including "empty miles". Mr. Bruger accepted the job and commenced his performance, and the very first paycheck/settlement report reflected the promised rate of compensation of 50 cents per mile.

64. Mr. Bruger had no reason to expect that Olero would pay for fewer miles than he actually drove and that it would deduct from his pay on regular basis for various dubious "charges" because this was never the practice at other places he worked for.

65. Mr. Bruger drove a company truck at all times while working for Olero. The specific truck he drove belonged to Defendant EMB, and displayed a DOT MC number for EMB. He did not lease the truck from the defendant companies. Olero and EMB provided all work assignments for him and Mr. Bruger did not have customers of his own. Olero and EMB set the prices charged for all deliveries, billed their customers for work performed and collected the receivables.

66. Defendants never paid for all the miles Mr. Bruger driven. Mr. Bruger, like all other drivers, was required to complete Log Books and submit them upon return to the office whenever he was in Illinois. Mr. Bruger insisted on filling out his own Log Books but Defendants would alter the Log Books each and every time. Mr. Bruger believes that this was done for two reasons, with the same reasoning that Stepan holds.

67. On average, Mr. Bruger would drive approximately 13,000 miles per month. At the very least, he was underpaid for 10% of the actual distance he drove while working for Defendants, which amounts to approximately $5,850.00 of unpaid but earned compensation during 9 months of his employment with defendant companies.

68. Defendants never told Mr. Bruger that they would pay for fewer miles than he would actually drive. In fact, he was promised to be paid for all miles he would drive. If Defendants told him that at hiring, he would have never agreed to take the job.

69. Defendants deducted a $25.00 charge for completing the Log Books from two paychecks, totaling $50. Mr. Bruger was never told about this charge when he was being offered this job. Mr. Bruger vigorously objected to this deduction and threatened to terminate his employment if these deductions continued. Other deductions that were made from Mr. Bruger's paycheck include the following examples:

i.   $1500.00 for "truck repair" after an accident.

ii.  $300.00 for "trailer's damage".

iii. $500.00 for "bad tires".

iv.  $740.00 for "D.O.T. violation".

v.   $1000.00 for "cargo damage."

vi.  $1500.00 for "truck repair."

vii. $2280.00 for unpaid compensation for the last few loads Mr. Bruger delivered prior to

terminating his employment, totaling least 4,560 miles.

70.   The total amount of deductions was $7,870.00. Mr. Bruger was never told when offered this job that such expenses or charges would be deducted from his pay.

71.   Over the course of Mr. Bruger's employment, which lasted for 9 months, Defendants did not pay approximately $15,220.00 for the work he performed and compensation he earned because of deductions from his pay and paying for fewer miles than he actually drove.

72.   Since the time when the statutory 2% interest per IWPCA began to accrue, the interest on the unpaid said compensation to date is $6,952.66, whereby this figure continues to rise each month subsequent to the filing of this Complaint.

73.    Defendants also deducted and withheld from Mr. Bruger's earned compensation $1,500.00 in so-called "escrow". This amount was only repaid on or about December 1, 2017, 10 months after it was originally withheld on February 6, 2017. Thus, Defendants incurred $328.49 in statutory interest under the IWPCA during that period.

74.   The total amount of damages that Mr. Dmytro Bruger claims in this Complaint is approximately $22,172.66, not including attorney's fees and costs. Mr. Dmytro Bruger worked for Defendants for 9 months.

<u>Defendants' violations as committed on a class basis</u>

75.   Plaintiffs and all other similarly situated shared similar job titles, followed the same policies and practices, performed similar duties and, as a result of Defendants' common scheme, were caused to work without compensation due to Defendants' common scheme of r e g u l a r , i l l i c i t deductions from Plaintiffs' pay.

76.   Defendants Romanyuk and Minochkin ran their respectively owned companies Olero and EMB as sister companies, and drivers would work interchangeably for one or the other.

77.   Defendants, during the relevant time period, altered the Log Books that the Plaintiffs would

17

submit after each performed task by reducing the number of actual miles driven. As a result, Defendants paid all of their drivers for fewer miles than they actually drove, failing to compensate the drivers for all of their work performed. Defendants did not pay Plaintiffs for the actual miles driven but for the reduced number of miles Defendants calculated by altering the log books, and which formed the base pay from which the further deductions were made. Plaintiffs never consented to such deductions. On average, Plaintiffs and others similarly situated have not been compensated for approximately 10% of the actual miles they drove; a full accounting will be necessary to ascertain the amount of underpayment, as Defendants are in possession of all relevant documents.

78. Most weeks, Defendants charged the drivers a $25.00 weekly payroll deduction for the "up-keep" of the Log Books. Defendants imposed this "log book" deduction from pay checks on a regular basis for some drivers regardless of whether the log books were completed accurately and properly and regardless of whether they were submitted timely or delayed.

79. Defendants refused to pay Plaintiffs and others similarly situated full compensation, as they charged illicit deductions for "late arrival", "DOT inspection fees", "tickets issued by state patrol to drivers and to the company", "cash advances" (despite the provided receipts for reimbursement), "damage to bumper", "repairs", "damages", "damaged headlight" and numerous other deductions which varied from Plaintiff to Plaintiff and others similarly situated in terms of the actual amounts deducted and the frequency of these deductions made. Plaintiffs never consented to any such deductions.

80. Defendants imposed "DOT violation" deductions whereby Defendants would deduct the DOT fines and also impose company fines upon its drivers for incurring DOT violation as a means of punishing its drivers. Drivers would often incur DOT violations due to being

18

ordered by Defendants to shorten their driving times to deliver freight/cargo to Defendants'
customers faster than drivers could in light of the government restrictions on the time a
truck driver could spend behind the wheel. For the very DOT violation caused by the
direction and orders of Defendants, the Defendants would also penalize their drivers for
incurring such fines by deducting the cost of fines from drivers' pay. Plaintiffs and other
similarly situated drivers never consented to such deductions.

81. Defendants charged drivers "deposits" or "escrow" by way of making deductions of at least
$1,500 or more from their initial compensation. Plaintiffs and others similarly situated
never agreed to such a deduction. Some Plaintiffs, such as Stepan and Dmytro Bruger,
were repaid their escrow deposits with great delay, whereas some others never received
their deposits.

82. Defendants engaged in the unlawful practice of deducting from Plaintiffs' pay and the pay
of others similarly situated the damages Defendants claimed to incur as a result of the
Plaintiffs' delivery of goods that the Defendants would allege were damaged upon receipt
by third parties while the Plaintiffs and similarly situated never consented to such
"deductions" or withholdings.

83. Defendants engaged in the unlawful practice of withholding the Plaintiffs' pay and the pay
of others similarly situated for a period exceeding two weeks and at times, a period
exceeded six weeks or more, when the Plaintiffs and others similarly situated never
consented to such withholdings.

84. Defendants engaged in the unlawful practices of refusing to withhold federal, state, payroll and
social security taxes as well as refusing to pay Defendants' share of payroll tax and
unemployment tax for the benefit of the Plaintiffs and others similarly situated, whereby
causing Plaintiffs and others similarly situated damages in the amount of unpaid FICA and

under-withheld taxes and additional sums to be paid by the Plaintiffs and other similarly situated in place of Defendants.

85. Defendants' practices violated the Illinois Wage Payment and Collection Act and the amounts of damages claimed by drivers-putative class members are very similar and range between $2,500 and $27,000, depending on the length of their employment for defendant companies, excluding interest that accrued since the unpaid compensation became due and owing.

86. Defendant companies also employ owner-operators who lease their trucks to Defendant companies but remain under complete control of Defendant corporate employers. Their trucks display "Olero" or "EMB Group" signs on the vehicle siding.

87. As a result of Defendants' improper and willful failure to pay Plaintiffs and others similarly situated in accordance with the requirements of the IWPCA, Plaintiffs and others similarly situated suffered lost wages and other actual damages.

Defendants' Scheme to Misclassify Plaintiffs and Putative Class Members as Independent Contractors:

88. Sometime in 2008, prior to Olero's formation in January of 2009, Defendants Romanyuk and Minochkin entered into an agreement to develop a scheme to misclassify their drivers, including Plaintiffs and Putative class members.

89. Though corporate Defendants treated their drivers as independent contractors, they had a classic employer-employee relationship as defined by the IWCPA, due to the total control Defendants had over their drivers.

90. Some features of Defendants Romanyuk and Minochkin's scheme to misclassify Corporate Defendants' employees as independent contractors included avoiding the application of payroll tax withholding and remittance under the US Tax Code, creating fictitious

equipment leases between drivers and the companies, and mandatory independent contractor agreements.

91. While Defendants did not require their drivers to execute said independent contractor agreements, they did require Plaintiffs and putative class members to enter such agreements in the capacity of officers/directors of their own corporate entities, owned by the drivers. Defendants then paid their drivers' compensation into their corporate accounts, so as to further the illusion of a contractor relationship.

92. Defendants required the putative class members to drive full time to the extent of the maximum permissible time on the road for an interstate truck driver per DOT regulations if the drivers wanted to keep their jobs. Moreover, Defendant companies required and compelled the putative class members and the Plaintiff to drive in excess of permitted number of hours on the road, in violation of the US Department of Transportation Federal Motor Carrier Safety Administration regulations. The Defendant companies per individual Defendants' instructions would cover up these violations later on by altering log books.

93. Plaintiff and putative class members at all times performed their work by hauling loads and while driving the trucks that were owned by one of the Defendant companies. There were multiple fictitious "lease agreements" that the Defendant companies forced the Plaintiffs and putative class members or their corporate entities to execute.

94. The Defendants employed and continue to employ drivers who operated "company trucks" belonging to Corporate Defendants, as well as owner-operators of their own trucks.

95. Working for the Defendants and operating their equipment was the usual and only place of work for all drivers working for the Defendants.

96. The Plaintiffs and putative class members were never free from control and direction by the Defendant companies and Defendants Romanyuk and Minochkin over the performance of

their work, both under agreements and in fact.

97. All work that the Plaintiffs and putative class members performed was never outside the usual course of business and was never performed outside all places of business of the Defendant companies as they drove the trucks owned by Defendant companies (or leased to and under the control of Defendant companies, or trucks owned by owner-operators that were or are leased to and under the control of Defendant companies), and because they never hauled loads under the direction, dispatch, request, or control of any other transportation company during the time they worked for the Defendant companies.

98. Defendant Romanyuk's and Minochkin's misclassification of the Plaintiffs and the putative class members as independent contractors was done knowingly and intentionally. Individual Defendants' willful misclassification was and continues to be done in direct violation of Section 2 of the Illinois Wage and Payment Collection Act.

99. The Plaintiffs and the Class are "employees" within the meaning of the IWPCA. All Plaintiffs spent significant time working in the State of Illinois by delivering cargo from and to the Defendants' customers in Illinois. The Plaintiffs also spent significant amount of time in Illinois during the transport of cargo from state to state. At all relevant times, approximately ten to twenty five percent of the Plaintiffs and class members have permanently resided or reside in the State of Illinois. The named Plaintiffs are residents of the State of Illinois.

Defendants' control over their employees

100. The Defendants exerted strict control over Plaintiffs' and others' similarly situated work, including the number of hours worked, distances driven and tasks performed by Plaintiffs and others similarly situated.

101. The Defendants dictated, controlled and ratified the wages, hours, tasks and all related

employee compensation policies and practices for Plaintiffs and others similarly situated.

102.     Defendants provided all work assignments for Plaintiffs, who did not have customers of their own, nor were they allowed to seek them out. Defendants set the prices charged for all deliveries, billed customers for work performed, and collected receivables.

103.     Defendant companies had their own dispatch; they required drivers to report to Defendant companies and penalized them if failing to do so, and they required drivers to take drug tests at the facilities the Defendant companies approved of.

104.   Plaintiff and putative class members were required by Defendants to haul loads and transport cargo for Defendant Companies via specific routes, avoiding specific toll roads, in a specific order, and in a specific number of hours. If drivers failed to complete their deliveries in the order specified by Defendants or otherwise failed to comply with afore-listed requirements, they would be subject to discipline.

105.   The Defendants retained the right to terminate drivers for any reason.

106.   Defendants did not allow their drivers to work for any other entities throughout their employment

107.   The Defendants dictated strict compliance with their work policies and means of performance of drivers' duties which demonstrate that the Plaintiff and others similarly situated were employees for Defendant companies and not independent contractors.

108.   Plaintiff and others similarly situated performed integral services within Defendants' usual course of business, which was to deliver freights, or loads, for Defendants' clients, and did so under Defendants' specific instructions.

109.   The duties of Plaintiff and putative class members were not project-based, but rather performed on a continual and indefinite basis, as their services to Defendants were an integral part of the Defendants' business operations.

110. Defendants determined and controlled which customers the Plaintiffs and the proposed class members could and would service, including time, place, and the freight or loads to be hauled and delivered.

111. The Defendants required Plaintiffs and all similarly situated drivers to come to Defendants' head office in Illinois for job interviews with the Defendants' officers. Individual Plaintiff Stepan Bruger interviewed with Defendant Romanyuk in October of 2016, and worked until August 2017. Individual Plaintiff Dmytro Bruger interviewed with Defendants Romanyuk and Minochkin in February of 2017, and worked for Defendants until October of 2017.

112. The Defendants required Plaintiffs to use the Defendants' vehicles in performance of their duties, which were registered in Illinois and owned by Illinois-registered companies and which displayed "Olero" or "EMB Group" signs on the vehicle siding. Those entities are solely owned respectively by Defendant Romanyuk and Defendant Minochkin.

113. When in Illinois, the Defendants required Plaintiffs to bring the vehicles to Defendants' facilities in Illinois for regular maintenance, such as oil changes and repairs.

114. The Defendants required and continue to require that the Plaintiffs and class members submit all bills of lading, log books, receipts and other required paperwork to their head office in Illinois .

Individual Defendants' involvement

115. Defendants Romanyuk and Minochkin are the chief decision-makers and executives at EMB and Olero, and therefore had final responsibility for all decisions made to misclassify and underpay Plaintiffs.

116. Defendants Romanyuk and Minochkin promised to compensate the Plaintiffs for

all of their work, and thereby induced the Plaintiffs and others similarly situated to accept jobs with Defendant companies.

117.     Individual Defendants knowingly permitted or otherwise caused the Defendant companies to wrongfully deny payment of compensation to Plaintiffs by actively participating in the decision making to do so.

118.     Individual Defendants established the policies for Defendant companies which violated the IWPCA, and devised a scheme to underpay Plaintiffs, make illicit deductions from their compensation, and sometimes refuse to issue any paychecks at all to Plaintiffs and other similarly situated drivers.

119.     Individual Defendants refused to address any grievances raised by truck drivers as they knew that most of their drivers were recent immigrants with limited language skills and legal sophistication, and that that as a result, the drivers would take the job as offered and would not complain about their misclassification or underpayment of wages.

120.     Individual Defendants knowingly and willfully committed the above-described violations for their own benefit, and for the benefit of their companies.

### VII. CLASS ALLEGATIONS

121.     Plaintiffs bring claims for relief on their own and as a class action pursuant Fed R. Civ. P. 23 for the following class:

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and who personally provided freight cargo transportation services pursuant to independent contract agreements entered into individually or on behalf of other entities to Defendant companies and who have not been classified as employees of Defendant*

*companies."*

122.    The class or subclasses of plaintiffs, estimated to contain 300 drivers, is so numerous that joinder of all members is impracticable;

123.    There are common questions of law and fact as to whether Defendants improperly misclassified the drivers as independent contractors and the drivers were and are in fact covered by the IWPCA; whether the drivers are entitled to recover the amounts deducted by the Company from their wages and an unpaid but earned compensation; that each driver has the same potential claim and types of damages, and these common questions of law and fact predominate over any possible questions affecting only individual members;

124.    The named Plaintiffs and their attorneys will adequately protect the interests of the entire class.

125.    Class treatment in this particular case is the only appropriate means for the fair and efficient adjudication of the controversy because of the length of the dispute, the intimidation and retaliation threats and actions by Defendants over the course of many years, the amount of individual damages and the prohibitive costs of individual suits.

**Numerosity**

126.    The total number of members of the proposed class represents approximately 300 or more individuals. The exact number of class members may only be determined from Defendants' records. The proposed class is sufficiently numerous to make joinder of all of its members impracticable.

127.    The proposed class of approximately 300 Defendants' truck drivers, who were denied full wages, proper payroll contributions and were not covered by workers' compensation and unemployment insurance, just to name a few Plaintiffs' contentions,

represent sufficient number of individuals with respect to their complaint against Defendants.

128.     The amount of each claim is relatively small if compared to the costs of bringing an individual claim: filing fees, discovery, and the costs of commute to depositions, appearances in court, hearings and trial.

129.     The amounts of Plaintiffs' claims are very similar and range between $2,500 and $27,000, excluding interest that accrued since the unpaid compensation became due and owing. These amounts are based on what Plaintiffs can ascertain based on documentation they currently possess and could change upon the review of all relevant documentation in possession of Defendants. The amounts of claims vary based on the length of truck drivers' employment with Defendants. The amounts do not include contributions under FICA, penalties and interest which may only be determined after determining the full compensation that Defendants were required to pay Plaintiffs.

130.     The putative class members do not have ability to bring the claims on their own behalf because of the prohibitive costs. Even if they had ability to bring a suit on their own behalf, the likelihood of them doing so would be close to zero.

131.     The Plaintiffs believe that Defendants would intimidate Plaintiffs and Plaintiffs would not be able to oppose the Defendants if the Plaintiffs were to stand up for their rights in court individually. Defendants oppressed them, violated their rights repeatedly and without any remorse, and intimidated them throughout the length of Plaintiffs' employment. Defendants are highly likely to continue with the same tactics if Plaintiffs were to sue individually or as a joinder. There are at least approximately 300 putative class members scattered across Illinois and the United States, who are truck drivers involved in an ongoing commute. It would be impractical and impossible for the Plaintiffs to prosecute

their claims individually or as a joinder because of geographic constraints.

132.     The proposed class is made up of the "smaller guy". The class consists of individual truck drivers, who, for the most part, are newly licensed commercial drivers, most are recent immigrants to this country with its complicated rules and regulations and are not sophisticated or in position to seek legal redress individually.

133.     Joinder of all or even a substantial percentage of class members as individual Plaintiffs clearly would be prohibitively expensive and impracticable for the same reason as if Plaintiffs were to bring their claims individually.

### Commonality

134.     All of Plaintiffs' claims have common questions of law because they all arise pursuant to violations of IWPCA and other federal and state regulations as described in this Complaint. There are numerous and substantial questions of law and fact common to members of the state classes including, but not limited to, the following:

135.  Whether Defendants unlawfully misclassified putative class members as independent contractors as opposed to employees'

136.    Whether Defendants failed to pay "wages" and "final compensation" by making unlawful deductions or withholdings from Plaintiffs' paychecks;

137.  Whether Defendants failed to make proper payroll contributions and other tax contributions and withholdings on behalf of Plaintiffs;

138. Whether Defendants failed to compensate class members for all the work they required according to the rate and wages Defendants promised to pay Plaintiffs at hiring and upon forming employment agreement to hire Plaintiffs and Plaintiffs commencing their performance;

139.  Whether Defendants engaged in a pattern, practice or policy of making unlawful

deductions from the pay of class members;

140. Whether Defendants engaged in a pattern, practices or policy causing class members to falsify the "Log Books" reflecting the distances driven and tasks performed as to also pay the drivers for less miles that have actually driven;

141. Whether Defendants willfully failed to comply with state wage laws pursuant to IWPCA;

142. Whether Defendants failed to pay final compensation to members of the proposed class, in part or in full in accordance with IWPCA;

143. Whether Defendants failed to pay the final compensation on time in accordance with the IWPCA.

144. Whether Defendants failed to compensate the truck drivers-trainees, to whom the Defendants promised compensation and with whom Defendants formed an employment agreement for trainees' training for benefit of Defendants and provision of services to Defendants.

145. Whether Defendants violated Section 3 of IWPCA which requires every employer, at least semi-monthly, pay every employee all wages earned during the semi-monthly pay period. 820 ILCS 115/3.

146. Whether Defendants violated Section 4 of IWPCA which require that all wages earned by employee during semi-monthly or bi-weekly pay period be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. 820 ILCS 115/4.

147. Whether Defendants violated Section 5 of IWPCA which require every employer to pay final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. 820 ILCS 115/5.

148. Whether Defendants violated Section 9 of IWPCA which dictates that the deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made [...]. 820 ILCS 115/9.

149. Whether Defendants violated Section 10 of IWPCA, when they failed to notify employees, at the time of hiring, of the rate of pay and of the time and place of payment; when they failed to memorialize such notification in writing although it was feasible; when they failed to assure that both parties, Employer and a truck driver about to be hired, acknowledge such notification in writing; when Defendants failed to notify employees of any changes in the arrangements, specified above, prior to the time of change; when Defendants failed to keep records of names and addresses of all employees and of wages paid each payday, and when Defendants failed to furnish each employee with an itemized statement of deductions made from his wages for each pay period. 820 ILCS §115/10.

150. Whether individual Defendants are liable for violations of IWPCA under Section 13 of the Act.

151. Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employers. However, if any such class member should become known, he or she can "opt out" of this action.

152. Whether Defendants are liable for fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, conspiracy to commit the aforementioned fraud,

or conspiracy to violate the IWPCA.

153.    Whether Plaintiffs and class members are entitled to accounting.

154.    Whether Plaintiffs and class members are entitled to declaratory judgment with respect to presently employed drivers.

155.    Whether Plaintiffs and class members are entitled to restitution pursuant to their unjust enrichment claims.

156.    Plaintiffs anticipate that Defendants will raise defenses that are common to the class.

## Typicality

157.    The named Plaintiffs are adequate representatives of the class because all potential plaintiffs were subject to Defendants' uniform practices and policies. Further, the named Plaintiffs and the potential class plaintiffs have suffered the same type of economic damages as a result of Defendants' practices and policies.

## Adequacy

158.    The named Plaintiffs will fairly and adequately protect the interests of the class.

159.    Plaintiffs' interests are not and cannot be antagonistic or in conflict with the class as all Plaintiffs and members of proposed class would like to seek compensation for the work performed. All named Class Representatives and proposed class members have the common interest of determining whether Defendants are liable for money damages to the proposed class of Defendants' truck drivers for violations of their rights under IWPCA, and other federal and state tax regulations.

160.    Plaintiffs have retained experienced counsel that is competent in the prosecution of complex litigation with many years of experience in prosecuting Wage and Hour actions in this Court and other Courts, including Class Actions.

## Rule 23(b) Class Action Maintainable

161.    Finally, a class action is the only realistic method available for the fair and efficient adjudication of this controversy. The expense and burden of individual litigations makes it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Were each individual member required to bring a separate lawsuit, the resulting multiplicity of proceedings would cause undue hardship and expense for the litigants and the Court and would create the risk of inconsistent rulings which would be contrary to the interest of justice and equity.

## VIII. COUNT I: VIOLATIONS OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820CS §115/

162.    Plaintiffs re-allege and incorporate paragraphs 1 through 161 above as and for paragraph 162 of this Count I.

163.    Each corporate Defendant is an "employer" within the meaning of Section 115/2 of IWPCA. Each individual Defendant is an "employer" within the meaning of Section 115/2 of the IWPCA.

164.    Defendants violated Section 115/2 of the IWPCA by misclassifying Plaintiffs and those similarly situated.

165.    Defendants violated Section 115/3 and Section 115/4 of the IWPCA by failing to pay Plaintiffs and those similarly situated their wages in a timely manner.

166.    Defendants violated Section 115/5 of the IWPCA by failing to pay some Plaintiffs their final compensation in full and in a timely manner.

167.    Defendants violated Section 115/9 of the IWPCA by making unauthorized deductions from the paychecks of Plaintiffs and those similarly situated. These deductions were not required by law, did not benefit Plaintiffs, were not made in response to a valid wage

assignment order, and were not made with the express written consent of employees.

168.    Defendants violated Section 115/10 of the IWPCA by failing to notify Plaintiffs and those similarly situated of their true rate of pay in writing or orally at any point.

169.    The total amount of damages for Mr. Stepan Bruger is approximately **$24,939.23 for 11 months of employment with Defendants**, with interest accrued to date but excluding attorney's fees and costs, while Mr. Dmytro Bruger's damages are approximately **$22,172.66 for 9 months of employment with Defendants**, with interest accrued to date but excluding attorney's fees and costs.

170.    Individual Defendants Romanyuk and Minochkin are personally liable for the corporate Defendants' violations of the IWPCA, pursuant to Section 115/13 of the IWPCA. Add para: Defendants are liable for all attorney's fees and costs pursuant to Section 115/14 of the IWPCA.

<u>Punitive Damages</u>

171.    Defendants knowingly and willfully violated the IWPCA, being employers, who, being able to pay wages, and being under a duty to pay, willfully refused to pay as provided in the IWPCA, with intent annoy, harass, oppress, hinder, delay and defraud their drivers.

172.    Defendants were already aware that their misclassification and underpayment schemes were in violation of the IWPCA, as they have previously been sued in the Circuit Court of Cook County, Illinois, Chancery Division for IWPCA violations at least once before, in the matter of Sergey Karichev vs. Minochkin & Olero; Case No. 2015CH09672.

## IX. COUNT II: FRAUD IN THE INDUCEMENT

173.    Plaintiffs re-allege and incorporate paragraphs 1 through 172 above as and for paragraph 173 of this Count II.

174.    Defendant Romanyuk interviewed Plaintiff Stepan Bruger in October of 2016 at his Chicago head office for a position driving trucks for Corporate Defendant Olero.

175.    During Plaintiff Stepan Bruger's interview, Defendant Romanyuk made the following false statements of material facts, orally and/or in writing to Plaintiff:

    a.  That the company would pay Stepan for his work for Olero and EMB at $0.50 per mile driven, and without any fees or fines or charges deducted from his pay;

    b.  That Stepan would be required and expected to work for the company only, using Defendant company's equipment, i.e. their truck and trailer.

    c.  That Defendants were honest employers, and that Defendants paid all of their currently working drivers (as of October 2016) in full and on time.

176.    Defendant Romanyuk consistently and repeatedly underpaid Plaintiff Stepan Bruger his wages and compensation when driving for Defendants between October 2016 and August 2017, and have yet to pay him the amount owed.

177.    Defendant Romanyuk and Defendant Minochkin interviewed Plaintiff Dmytro Bruger in February of 2017 at their Chicago head office for a position driving trucks for Corporate Defendant Olero.

178.    During Plaintiff Dmytro Bruger's interview, Defendants Romanyuk and Minochkin made the following false statements of material facts, orally and/or in writing to Plaintiff Dmytro Bruger:

    a.  That the company would pay Dmytro for his work for Olero and EMB at $0.50 per mile driven, and without any fees or fines or charges deducted from his pay;

    b.  That Dmytro would be required and expected to work for the company only, using Defendant company's equipment, i.e. their truck and trailer.

    c.   That Defendants were honest employers, and that Defendants paid all of their currently working drivers (as of October 2016) in full and on time.

179.    Defendants Romanyuk and Minochkin consistently and repeatedly underpaid Plaintiff Dmytro Bruger his wages and compensation when driving for Defendants between February 2017 and October 2017, and have yet to pay him the amount owed.

180.    Defendants Romanyuk and Minochkin developed a scheme to present false statements to Plaintiffs while never intending to comply with those promises and knowing that Plaintiffs would not uncover this fraudulent scheme until after they had been induced to accept employment offers and commenced working.

181.    Defendants Romanyuk and Minochkin knew these statements were false at the time they were made, as they were at that time underpaying and misclassifying their existing employees, and intended to (and did) treat Plaintiffs in the same manner. Specifically, at the time of Stepan and Dmytro's respective interviews, Defendants Romanyuk and Minochkin were already underpaying and misclassifying the drivers who worked for them, and naturally had no intention of treating the Brugers any differently.

182.    Defendants Romanyuk and Minochkin intentionally withheld material facts from Plaintiffs at hiring, which equally constitutes a false statement of material facts.

183.    Defendants Romanyuk and Minochkin clearly and unequivocally intended that their false statements of material facts to Plaintiffs and withholding of material facts from them would induce Plaintiffs to accept their employment offers and begin working for Defendants:

184.    Defendants Romanyuk and Minochkin clearly directed their false statements of material facts at Plaintiffs hoping they would rely on such would accept a job with Defendant companies.

185.     There was no other reason for Defendants Romanyuk and Minochkin to direct their false statements of material facts at Plaintiffs other than to entice Plaintiffs to enter into an agreement to work with Defendant companies and commence working for Defendants.

186.     Plaintiffs did rely on Defendants Romanyuk and Minochkin's false statements of material facts and the withheld true statements of material facts by the individual Defendant when they accepted a job with Defendant companies.

187.     The damages of Plaintiffs stem from their reliance on individual Defendants Romanyuk and Minochkin's false statements of material facts and withholding of material facts when they accepted job offers, commenced work, and continued to work for Defendant companies Olero and EMB. The damages that Plaintiffs sustained are the unpaid wages and compensation which were promised to them at hiring, but which were denied through unauthorized deductions and unpaid miles driven.

188.     Defendants Romanyuk and Minochkin had no legal basis to defraud Plaintiffs and not pay them proper compensation they earned and were promised at hiring.

189.     Any and all misrepresentations of material facts or otherwise fraudulent misrepresentations were made by Defendants Romanyuk and Minochkin on behalf of and for the benefit of Defendant company, as well as for their own personal benefit.

190.     The individual Plaintiffs spoke to other drivers, learned that Defendants committed fraud in the inducement at hiring with all similarly situated drivers. Defendant Romanyuk and/or Minochkin would carry out the interviews and make the same false statements regarding their honest business practices, their timely and full payment of compensation, and their accurate classification of employees with all drivers they hired.

191.     Defendants were already aware that their misclassification and underpayment

schemes were in violation of the IWPCA, as they have previously been sued in the Circuit Court of Cook County, Illinois, Chancery Division for IWPCA violations at least once before, in the matter of Sergey Karichev vs. Minochkin & Olero; Case No. 2015CH09672.

192.    The actual damages that Plaintiffs sustained are in the amount of unpaid wages or compensation.

Punitive Damages

193.    Defendants' refusal to pay Plaintiffs the amount owed to them is vexatious, harassing, and in bad faith.

194.    That in addition to the amount of wages and/or final compensation the Defendants owe to Plaintiffs as a result of their failure to pay their owed wages and final compensation, as well as attorneys' fees and costs incurred as a result of their action, Plaintiffs are also entitled to punitive damages in an amount to be determined by the trier of fact because:

195.    Defendants Romanyuk and Minochkin knowingly and willfully made false statements of material fact to Plaintiffs and withheld from them true statements of material fact, and did so on behalf of and for the benefit of Defendant company, with an intent to induce Plaintiffs' reliance on individual Defendants' statements. The information individual Defendants Romanyuk and Minochkin withheld did induce Plaintiffs to accept job offers and work for Defendants in reliance on false statements, to Plaintiffs' detriment, as they were underpaid and misclassified. Defendants thus caused damages to Plaintiffs.

### X. COUNT III: FRAUDULENT MISREPRESENTATION

196.    Plaintiffs re-allege and incorporate paragraphs 1 through 195 above as and for paragraph 196 of this Count III.

197.    Stepan Bruger interviewed with Defendant Romanyuk at his Chicago office in October of 2016 for the position of truck driver at Defendant companies.

37

198.     Defendant Romanyuk made the following false statements of material fact and promises at individual Plaintiff Stepan Bruger's hiring interview in October of 2016:

    a.   That Defendants would pay Stepan's compensation in full and on time;

    b.   That Defendants were honest employers, and that Defendants paid all of their currently working drivers (as of October 2016) in full and on time.

199.     Defendant Romanyuk knew these statements were false and that Stepan would not uncover this fraudulent scheme until after he had been induced to accept the employment offer and commenced working. Particularly, Defendant Romanyuk knew that in October 2016, he was already underpaying and misclassifying his current drivers, and had no intention of treating Stepan any differently.

200.     Dmytro Bruger interviewed with Defendant Romanyuk and Defendant Minochkin at their Chicago office in February of 2017 for the position of truck driver at Defendant companies.

201.     Defendants Romanyuk and Minochkin made the following false statements of material fact and promises at individual Plaintiff Dmytro Bruger's hiring interview in February of 2017:

    a.   That Defendants would pay Dmytro's compensation in full and on time;

    b.   That Defendants were honest employers, and that Defendants paid all of their currently working drivers (as of February 2017) in full and on time.

202.     Defendants Romanyuk and Minochkin, from the moment employment commenced and at all times afterwards, misclassified Plaintiffs by treating them as independent contractors on payroll and for the purposes of the IWPCA, worker's compensation laws,

and Defendants' IRS and IDR reporting. Corporate defendant did not plan to pay, and did not pay, its share of mandatory FICA contributions to IRS for the benefit of Mr. Romanyuk, the State of Illinois, the federal government; did not intend to pay, and did not pay, workers' compensation and unemployment insurance to relevant authorities, and did not intend to make, and did not make, proper payroll tax withholdings on behalf of Plaintiffs. Such practice added to Defendants' income and caused damages to Plaintiffs.

203.     Defendants Romanyuk and Minochkin clearly and unequivocally made misrepresentations of material facts to Plaintiffs and withheld material facts from them in order to induce Plaintiffs to accept the employment offers and begin working for Defendants.

204.     Defendants Romanyuk and Minochkin knew the statements they made were false, because at the time of Plaintiffs' interviews, they already underpaid and misclassified all of the drivers working for them at the time. They also knew that they were planning to underpay and misclassify Plaintiffs for the duration of their employment, as they had already developed their unlawful scheme.

205.     Defendants were already aware that their misclassification and underpayment schemes were in violation of the IWPCA, as they have previously been sued in the Circuit Court of Cook County, Illinois, Chancery Division for IWPCA violations at least once before, in the matter of Sergey Karichev vs. Minochkin & Olero; Case No. 2015CH09672.

206.     Defendants Romanyuk and Minochkin intended to induce (and did induce) Plaintiffs to act on their misrepresentations by inducing them to accept positions with Defendants. Plaintiff Stepan Bruger only accepted the position because he had been told that he would be paid in full, on time, with no deductions, and Plaintiff Dmytro Bruger did

likewise.

207.     Plaintiffs reasonably and justifiably relied on Defendants Romanyuk and Minochkin's misrepresentations. Defendants' false promises to pay timely and in full for Plaintiffs' work performed sounded entirely plausible, as Plaintiffs had no reason to believe that Defendants intended to break the law. Defendants' fraudulent scheme to misclassify Plaintiffs and withhold their earned compensation was not information of public record, and therefore Plaintiffs could not have reasonably inquired and discovered that Defendants were concealing material facts from them.

208.     Had Plaintiffs been aware of the fact that they would not be paid on time as Defendants falsely affirmed, they would have acted differently and rejected the offers.

209.     Had Plaintiffs been aware of the fact that Defendants would make improper and unlawful deductions from their earned compensation, they would have acted differently and rejected the offers.

210.     The damages of Plaintiffs stem from their entirely reasonable reliance on individual Defendants Romanyuk and Minochkin's false statements of material facts and withholding of material facts when they accepted job offers, commenced work, and continued to work for Defendant company. Plaintiffs sustained actual damages due to their unpaid compensation and unpaid miles driven.

211.     Defendants Romanyuk and Minochkin had no legal basis to defraud Plaintiffs and not pay them proper compensation he earned and were promised at hiring.

212.     That any and all misrepresentations of material facts or otherwise fraudulent misrepresentations were made by Defendants Romanyuk and Minochkin on behalf of and for the benefit of Olero and/or EMB, as well as for their own personal benefit.

Punitive Damages

213.   That Defendants' refusal to pay Plaintiffs the amount due and owed to them is vexatious, harassing, and in bad faith.

214.   That in addition to the amount of wages and/or final compensation the Defendants owe to Plaintiffs as a result of their failure to pay their owed wages and final compensation, as well as attorneys' fees and costs incurred as a result of their action, Plaintiffs are also entitled to punitive damages in an amount to be determined by the trier of fact because:

215.   Defendants Romanyuk and Minochkin knowingly and willfully made false statements of material fact to Plaintiffs and withheld from them true statements of material fact, and did so on behalf of and for the benefit of Defendant company, with an intent to induce Plaintiffs' reliance on individual Defendants' statements. The information individual Defendants Romanyuk and Minochkin withheld did induce Plaintiffs to accept job offers and work for Defendants in reliance on false statements, to Plaintiffs' detriment, as they were underpaid and misclassified. Defendants thus caused damages to Plaintiffs.

## XI. COUNT IV: FRAUDULENT CONCEALMENT

216.   Plaintiffs re-allege and incorporate paragraphs 1 through 215 above as and for paragraph 216 of this Count IV.

217.   During Plaintiff Stepan Bruger's interview with Defendant Romanyuk in October of 2016, Defendant Romanyuk intentionally concealed and suppressed the following material facts from Plaintiff Stepan Bruger:

   a. That Defendant Romanyuk would unlawfully treat Stepan as an independent contractor and not as an employee as Defendant Romanyuk represented at hiring;

b. That Defendants would not pay Stepan in full and on time as Defendant Romanyuk had promised at the time of hiring;

c. That Defendant Romanyuk would consistently and repeatedly underpay Stepan his wages and compensation;

d. That at the time of the hiring interview, Defendant Romanyuk was already misclassifying and underpaying all of the truck drivers he employed at that point.

218. During Plaintiff Dmytro Bruger's interview with Defendants Romanyuk and Minochkin in February of 2017, Defendants Romanyuk and Minochkin intentionally concealed and suppressed the following material facts from Plaintiff Dmytro Bruger:

a. That Defendants Romanyuk and Minochkin would unlawfully treat Dmytro as an independent contractor and not as an employee as Defendants Romanyuk and Minochkin represented at hiring;

b. That Defendants Romanyuk and Minochkin would not pay Dmytro on time and in full as Defendants Romanyuk and Minochkin had promised at the time of hiring;

c. That Defendants Romanyuk and Minochkin would consistently and repeatedly underpay Dmytro his wages and compensation;

d. That at the time of the hiring interview, Defendants Romanyuk and Minochkin were already misclassifying and underpaying all of the truck drivers they employed at that point.

219. Defendants Romanyuk and Minochkin developed a scheme to conceal material facts from Plaintiffs concerning the full and timely payment of their compensation. Defendants Romanyuk and Minochkin knew that Plaintiffs would not uncover that these facts were concealed until after they had been induced to accept employment offers and commenced

42

working.

220. Defendants Romanyuk and Minochkin intentionally concealed material facts from Plaintiffs at hiring, which equally constitutes a fraudulent concealment of material facts. Defendants Romanyuk and Minochkin clearly and unequivocally concealed statements of material facts from Plaintiffs and withheld material facts from them in order to induce Plaintiffs to accept the employment offers and begin working for Defendants:

221. Plaintiffs could not have discovered the truth, concealed from them by Defendants, through reasonable inquiry. Defendants' fraudulent scheme to misclassify Plaintiffs and withhold their earned compensation was not information of public record, and therefore Plaintiffs could not have reasonably inquired and discovered that Defendants were concealing material facts from them.

222. Defendants controlled the flow of information to Plaintiffs regarding Defendant Company's employment and compensation policies. Therefore, Plaintiffs could not have anticipated the fraudulent scheme devised by Defendants Romanyuk and Minochkin.

223. Defendants were already aware that their misclassification and underpayment schemes were in violation of the IWPCA, as they have previously been sued in the Circuit Court of Cook County, Illinois, Chancery Division for IWPCA violations at least once before, in the matter of Sergey Karichev vs. Minochkin & Olero; Case No. 2015CH09672.

224. A fiduciary relationship arose between Defendants and Plaintiffs during their initial interview and existed throughout Plaintiffs' time working as truck drivers for Defendant company.

225. The corporate Defendants, and the individual defendants, as the officers or executives of said companies, were in a position of trust vis-à-vis the Plaintiffs. It was reasonable for

Plaintiffs to trust their interviewers to accurately describe the terms of their employment, including pay, deductions, and classification as employees. It was also reasonable for Plaintiffs to not expect Defendants to carry out an illegal scheme. Furthermore, Defendants' business expertise and sophistication was much more advanced than that of Plaintiffs, and Defendants took advantage of Plaintiffs' lack of English fluency to further deceive and take advantage of them.

226. Such a position of trust dictated not only that the Defendant company and individual Defendants accurately, truthfully and expeditiously account for and pay Plaintiffs all earned compensation, but also imposed onto them a duty to accurately communicate to Plaintiffs their true rate of pay, working conditions, employee status, and all other information relevant to their employment, prior to hiring them.

227. Accordingly, the Defendant companies and individual Defendants were in a position of trust with respect to Plaintiffs and owed a fiduciary duty to them because Defendants Romanyuk and Minochkin exerted extraordinary control and influence over them as their de-facto and de-jure employers.

228. Plaintiffs justifiably relied on false statements of material facts made by the individual Defendants when they accepted jobs with Defendant company.

229. Had Plaintiffs been aware of the fact that they would not be paid on time as Defendants falsely affirmed, they would have acted differently and rejected the offer.

230. Had Plaintiffs been aware of the fact that Defendants would make improper and unlawful deductions from their earned compensation, they would have acted differently and rejected the offer.

231. Had Plaintiffs been aware of the fact that Defendants would withhold their final

compensation, they would have acted differently and rejected the offer.

232. The damages of Plaintiffs stem from their entirely reasonable reliance on individual Defendant's false statements of material facts and withholding of material facts when they accepted job offers, commenced work, and continued to work for Defendant company. Plaintiffs' damages were caused by their underpayment, illicit deductions, and lack of payment for all miles driven.

233. Defendants Romanyuk and Minochkin had no legal basis to defraud Plaintiffs and cause Corporate Defendants to not pay them proper compensation which they earned and were promised at hiring.

234. The fraudulent concealment of material facts was committed by Defendants Romanyuk and Minochkin on behalf of and for the benefit of Defendant companies, as well as for their own personal benefit.

235. Defendants were already aware that their misclassification and underpayment schemes were in violation of the IWPCA, as they have previously been sued in the Circuit Court of Cook County, Illinois, Chancery Division for IWPCA violations at least once before, in the matter of Sergey Karichev vs. Minochkin & Olero; Case No. 2015CH09672.

236. The actual damages that Plaintiffs sustained are in the amount of unpaid wages or compensation.

<u>Punitive Damages</u>

237. The fraudulent concealment committed by Defendants, which resulted in the underpayment of Plaintiffs the amount due and owed to them is vexatious, harassing, and in bad faith.

235. That in addition to the amount of unpaid wages and/or final compensation the

Defendants owe to Plaintiffs, as well as attorneys' fees and costs incurred as a result of their action, Plaintiffs are also entitled to punitive damages in an amount to be determined by the trier of fact.

236. Defendants Romanyuk and Minochkin knowingly and willfully made false statements of material fact to Plaintiffs and withheld from them true statements of material fact, and did so on behalf of and for the benefit of Defendant company, with an intent to induce Plaintiffs' reliance on individual Defendants' statements. The information individual Defendants Romanyuk and Minochkin withheld did induce Plaintiffs to accept job offers and work for Defendants in reliance on false statements, to Plaintiffs' detriment, as they were underpaid and misclassified. Defendants thus caused damages to Plaintiffs.

## XII. COUNT V
## CIVIL CONSPIRACY TO VIOLATE THE IWPCA

237. Plaintiffs re-allege and incorporate paragraphs 1 through 236 above as and for paragraph 237 of this Count V.

238. Defendants Romanyuk and Minochkin met sometime in 2008 in order to plan out a conspiracy to commit IWPCA violations against their drivers.

239. Defendants Romanyuk and Minochkin agreed to violate the IWPCA by misclassifying all of their drivers as independent contractors and by underpaying them, charging them illicit deductions, and not returning their deposits in a timely manner (or at all). This scheme was to their financial benefit.

240. Defendants Romanyuk and Minochkin, on behalf of and for the benefit of Defendant companies they respectively own (Romanyuk – 100% shareholder of Olero, Inc., and Minochkin – 100% shareholder of EMB Group, Inc.) entered into agreements with each other and other unknown executives, management and employees of Defendant companies

to defraud Plaintiffs and others similarly situated to cause damage to Plaintiffs and others similarly situated and benefit at their expense. Individual Defendants knew that they would represent false statements of material fact to Plaintiffs and others similarly situated and withhold true material facts from them in order to induce them to accept employment offers with Defendant companies. Individual Defendants also knew that to implement and further their scheme to defraud, they would need to have an agreement to perpetrate the fraud and to act in concert to assure all Defendants and their agents and employees comply with their fraudulent intent.

241. Individual Defendants knew that they had no right under the IWPCA to withhold wages from Plaintiffs and others similarly situated earned. Individual Defendants also knew that to implement and further their scheme to violate rights of Plaintiffs and others similarly situated under the IWPCA, they would need to have an agreement to commit the violations and to act in concert to assure all Defendants and their agents and employees comply with their scheme to violate IWPCA and Plaintiffs' rights under the IWPCA. As a result, they planned out and entered into such an agreement, to coordinate their scheme.

242. By their actions, Defendants caused and continue to cause injury to Plaintiffs and others similarly situated by way of unpaid wages, unpaid final compensation, untimely and delayed payment of wages, by not paying payroll and other tax contributions on behalf of Plaintiffs and others similarly situated.

243. Individual Defendants committed overt acts in furtherance of the common scheme by misclassifying Plaintiffs as independent contractors, by taking deductions from their compensation in violation of IWPCA, as well as not paying them wages, all in direct violation of the IWPCA.

244. Individual Defendants committed civil conspiracy against Plaintiffs and others

similarly situated. The actions of individual Defendants and the conduct constituting civil conspiracy are imputed to Defendant companies that each individual Defendant respectively owns.

Punitive Damages

245. Defendants' conspiracy against Plaintiffs and others similarly situated is vexatious, harassing, and in bad faith.

246. That in addition to the amount of wages and/or final compensation the Defendants owe Plaintiffs and others similarly situated as a result of their conspiracy to violate IWPCA, and attorneys' fees and costs incurred as a result of their actions, and Plaintiffs and others similarly situated are also entitled to punitive damages in an amount to be determined by the trier of fact because:

247. Individual Defendants have knowingly and willfully committed conspiracy violate the rights of Plaintiffs and all other similarly situated under the IWPCA;

248. The commission of civil conspiracy in Illinois is an intentional tort, hereby the violation of IWPCA also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

249. Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiffs into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimidate Plaintiffs and others similarly situated - who do not have the financial and legal resources that the Defendants have at their disposal - into abandoning a legal right which Plaintiffs and others similarly situated properly asserted (*i.e.* to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

250. The Plaintiffs and putative class members who are not residents of Illinois are not

and would not be able to seek relief and recover damages in any other jurisdiction except for Illinois pursuant they would not be able to raise claims of Illinois civil conspiracy in other states and other jurisdictions that have similar common law causes of action do not permit suits and recovery against an out-of-state defendant.

## XIII. COUNT VI
## CIVIL CONSPIRACY TO COMMIT FRAUD IN INDUCEMENT, FRAUDULENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT

251.     Plaintiffs re-allege and incorporate paragraphs 1 through 250 above as and for paragraph 251 of this Count VI.

252.     Defendants Romanyuk and Minochkin met sometime in 2008 in order to plan out a conspiracy to commit fraud in inducement, fraudulent misrepresentation and fraudulent concealment in order to induce drivers to begin working for them.

253.     Defendants Romanyuk and Minochkin agreed to commit fraud in the forms of fraud in the inducement, fraudulent concealment, and fraudulent misrepresentation, in order to hire and retain drivers. They understood that if they told drivers the truth about their employment at hiring or later on- that they would be misclassified and underpaid, and that illicit deductions would be taken- those drivers would not agree to work for Defendants. Thus, they fraudulently induced drivers into accepting jobs, fraudulently misrepresented their employment practices, and fraudulently concealed the true situation in which drivers would find themselves.

254.     Defendants Romanyuk and Minochkin committed overt acts in furtherance of their conspiracy to defraud Plaintiffs and all those similarly situated when they invited them for hiring interviews and made false representations of facts pertaining to their employment, and concealed other material facts as to their employment. These overt acts were key to their

49

conspiracy to induce Plaintiffs and those similarly situated into accepting job offers which they would reject if they had known the true working conditions.

255.    Defendants Romanyuk and Minochkin, on behalf of and for the benefit of Defendant companies they respectively own (Romanyuk – 100% shareholder of Olero, Inc., and Minochkin – 100% shareholder of EMB Group, Inc.) entered into agreements with each other and other unknown executives, management and employees of Defendant companies to defraud Plaintiffs and others similarly situated to cause damage to Plaintiffs and others similarly situated and benefit at their expense. Individual Defendants knew that they would represent false statements of material fact to Plaintiffs and others similarly situated and withhold true material facts from them in order to induce them to accept employment offers with Defendant companies. Individual Defendants also knew that to implement and further their scheme to defraud, they would need to have an agreement to perpetrate the fraud and to act in concert to assure all Defendants and their agents and employees comply with their fraudulent intent.

256.    By their actions, Defendants caused and continue to cause injury to Plaintiffs and others similarly situated by way of unpaid wages, unpaid final compensation, untimely and delayed payment of wages, by not paying payroll and other tax contributions on behalf of Plaintiffs and others similarly situated.

257.    Individual Defendants committed overt acts in furtherance of the common scheme by advertising job positions with Defendants, interviewing Plaintiffs and others similarly situated, making false statements of material facts and withholding true material facts, by offering them jobs and hiring them, by not paying them wages earned and final compensation, by not making required tax withholdings and not paying required tax contributions on their behalf.

258.     Individual Defendants committed civil conspiracy against Plaintiffs and others similarly situated. The actions of individual Defendants and the conduct constituting civil conspiracy are imputed to Defendant companies that each individual Defendant respectively owns.

Punitive damages

259.     Defendants' conspiracy against Plaintiffs and others similarly situated is vexatious, harassing, and in bad faith.

260.     That in addition to the amount of wages and/or final compensation the Defendants owe Plaintiffs and others similarly situated as a result of their conspiracy to defraud them and attorneys' fees and costs incurred as a result of their actions, and Plaintiffs and others similarly situated are also entitled to punitive damages in an amount to be determined by the trier of fact because:

261.     Individual Defendants have knowingly and willfully committed conspiracy to defraud Plaintiffs;

262.     The commission of civil conspiracy in Illinois is an intentional tort, **and** the violation of IWPCA also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

263.     Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiffs into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimidate Plaintiffs and others similarly situated - who do not have the financial and legal resources that the Defendants have at their disposal - into abandoning a legal right which Plaintiffs and others similarly situated properly asserted (*i.e.* to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

264.     The Plaintiffs and putative class members who are not residents of Illinois are not and would not be able to seek relief and recover damages in any other jurisdiction except for Illinois pursuant they would not be able to raise claims of Illinois civil conspiracy in other states and other jurisdictions that have similar common law causes of action do not permit suits and recovery against an out-of-state defendant.

## XIV. COUNT VII
## DECLARATORY JUDGMENT

265.     Plaintiffs re-allege and incorporate paragraphs 1 through 264 above, as and for paragraph 265 of this Count VII.

266.     Plaintiffs and the class members, specifically, drivers who are currently employed by Defendant companies, have substantial legal interests in being properly classified as employees under IWPCA, in the earned compensation in full and on time, and therefore, in the outcome of this Court's decision as to the legality of Defendants' conduct.

267.     There are currently members of the putative class who remain employed by the Defendant companies and are directly and adversely affected by Defendants' wrongful policies and ongoing violations of agreements to compensate the said truck drivers for all work they perform.

268.     Furthermore, the IWPCA is a public interest law. The courts, as well as IDOL, are expressly vested with the authority to enforce the IWPCA, so as to protect not only the interests of the named Plaintiffs and all those similarly situated, but the interests of Illinois residents as a whole. It is an issue of public policy when an employer misclassifies their employees, underpays them, makes illegal deductions, and thereby undercuts the legal protections that are in place to protect all Illinois employees from such practices.

269.     Plaintiffs and the class members, specifically, currently employed drivers, have a

legal, tangible interest in that the Defendants must cease the unlawful misclassification of drivers as independent contractors, and because Defendants continue to owe and withhold from Plaintiffs' paychecks the unpaid "wages" or "final compensation", which the Plaintiffs and class members have rightfully earned and are entitled to.

270.    Defendants have interests adverse to Plaintiffs and the putative class members (specifically, currently employed drivers) in that by unlawfully misclassifying them as independent contractors and improperly withholding earned compensation on a per mile basis and tasks performed, "wages" and/or "final compensation", and by failing and refusing to pay said earned compensation on a per mile basis and tasks performed, "wages" and/or "final compensation", Defendants benefit at the expense of the Plaintiffs and the putative class members.

271.    An actual case or controversy exists between Plaintiffs and the putative class members (those currently employed) on one side and the Defendants on another, due to the fact that, as alleged, Defendants have unlawfully misclassified them as independent contractors and then improperly withheld earned compensation on a per mile basis and tasks performed, "wages" and/or "final compensation" by creating "deductions" and refusing to pay the agreed-upon final compensation upon termination of Plaintiffs' employment.

272.    Current employees and all new hires of Defendant companies are members of the proposed class.

273.    Defendants must be ordered to cease the misclassification tactics and must be ordered to account for all current and former employees' improperly withheld compensation, should be enjoined from dispersing said improperly withheld funds and said funds should be placed in a constructive trust until further order of the Court.

274.    The Court can resolve this dispute by declaring the parties' rights and

obligations under Illinois law. Namely, the Court can declare Defendants' practice of misclassifying their employees as independent contractors, declare Defendants' refusal to pay their current and terminated employees their earned compensation, declare the rights of the parties pursuant to the IWCPA, and declare Defendants to be unjustly enriched by their retention of money owed to their employees.

## XV. COUNT VIII
## ACCOUNTING

275.    Plaintiffs re-allege and incorporate paragraphs 1 through 274 above, as and for paragraph 275 of this Count VIII.

276.    Pursuant to the above-described claims and causes of action, the circumstances or relationship between the parties gives rise to a duty on the part of the Defendants to account to Plaintiffs and the putative class members. The Defendants, being the defendant employer companies and the officers or executives of the two Defendant employer companies, i.e. the individual defendants, were and are in a position of trust as to its employees to accurately, truthfully and expeditiously account for and pay the Plaintiffs and the putative class members all earned compensation improperly withheld by Defendants.

277.    The Defendants must provide original, true and accurate documentation pertaining to all Plaintiffs' and class members' compensation, including but not limited to log books, freight confirmations, and bills of lading. These documents are in Defendants' control, and as they were, upon information and belief, regularly falsified, Plaintiffs cannot possibly know how precisely how much they are owed without access to accurate records.

278.    As the employers of Plaintiffs and all similarly situated, individual and corporate Defendants owed them a fiduciary duty. The Defendant companies and individual Defendants were and are in a position of trust with respect to Plaintiff employees and

members of the putative class and owe fiduciary duty to them because the Defendants exerted extraordinary control and influence over the Plaintiffs and class members due to being de-facto and de-jure employers of Plaintiffs and putative class members.

279.    Special circumstances also exist which created a fiduciary duty from Defendants to Plaintiffs and putative class members since the Plaintiffs and class members, for the most part, lack sophisticated education and experience. The Defendants knew that the Plaintiffs and putative class members lack the requisite English language skills and had otherwise experienced language barriers in communicating with individual Defendants and defendant companies' personnel, including during the performance of required tasks. The Defendants had superior knowledge and understanding that the Plaintiffs and putative class members would not have because they lacked and lack the resources to defer to legal advisors or translators during the hiring process and thereafter. The Plaintiffs and putative class members had a great level of deference and trust towards Defendants because of the lack of sophisticated education, experience, and requisite language and communication skills.

280.    Plaintiffs provided personal services to the Defendants with the common, mutual and reciprocal understanding that they would receive compensation in full.

281.    There is a need for discovery through accounting because the amount of compensation to which the Plaintiffs and the putative class members are entitled and which they have earned greatly exceed the amounts which they have actually been paid.

282.    There is also a need for discovery through accounting because the amount of compensation to which the Plaintiffs and the putative class members are entitled and which they have earned, plus interest due to Plaintiffs and the putative class members cannot be presently known, because all books of accounts and records pertaining to the dispute are in the possession and control of the Defendants, and based thereon the Plaintiffs and the putative

class members need an accounting thereof and discovery with respect thereto to ascertain the damages they are entitled to recover.

283.     Accordingly, an accounting would permit Plaintiffs and the putative class members (and the Court) to ascertain the amounts due to the Plaintiffs and the putative class members.

284.     The Plaintiffs demanded that the Defendants and their management account for and pay all of their earned compensation, and the Defendants had refused to pay same.

285.     An accounting should be conducted in equity for the following reasons:

286.     The need for an accounting has arisen from the above-described fiduciary relationship between the parties; and

287.     There is a need for accounting supervised by this Court, because it would involve intricate itemizations of earned compensation as damages awards and interest.

## XVI. COUNT IX
## UNJUST ENRICHMENT, pled in an alternative to Count I

288.     Plaintiffs re-allege and incorporate paragraphs 1 through 287 above, as and for paragraph 288 of this Count IX, except for the paragraphs forming allegations in Count I.

289.     Defendants received revenue and benefits by and through the efforts of the Plaintiffs and the putative class members and improperly withheld the Plaintiffs' and the putative class members' earned compensation to their detriment and damage, all in violation of fundamental justice, equity and good conscience.

290.     Plaintiffs and the putative class members have conferred a benefit on Defendants through their service of driving as interstate truck drivers hauling loads and cargo for Defendants' benefit and to its detriment because of Defendants' practices and policies of misclassifying the drivers as independent contractors and not paying earned compensation to current employees or employees that have terminated their employment with Defendants

(voluntarily or not voluntarily), prior to the disbursement of the payment checks, and because of Defendants' failure and refusal to pay Plaintiffs and the putative class members their earned compensation; and Defendants have knowledge of this benefit and have accepted and retained the benefits conferred on them.

291.    Defendants will be unjustly enriched if they are allowed to retain the improperly withheld the Plaintiffs' and the putative class members' earned compensation of their current and former employees. Defendants will be unjustly enriched if they are allowed to retain their self-imposed forfeiture of the withheld employees' compensation. Defendants will be unjustly enriched if they are allowed to retain withheld compensation.

292.    This Count IX is pleaded in an alternative to Count I.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

a.      Certifies the class and appoint Plaintiffs and Plaintiffs' counsel to represent the class;

b.      Finds that the Defendants violated the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1, § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10 and hold them liable jointly and severally;

c.      Finds Individual Defendants personally liable under Section 13 of IWPCA and hold them liable jointly and severally;

d.      Finds that Defendants committed fraud in the inducement against Plaintiffs and others similarly situated;

e.      Finds that Defendants committed fraudulent misrepresentation against Plaintiffs and others similarly situated;

f.      Finds that Defendants committed fraudulent concealment against Plaintiffs and

others similarly situated;

g.    Finds that Defendants committed civil conspiracy to violate the rights of Plaintiff's and those similarly situated under the Illinois Wage Payment and Collections Act;

h.    Finds that Defendants committed civil conspiracy to perpetrate common law fraud against Plaintiffs and others similarly situated;

i.    Declares the rights of the parties, as alleged herein through the declaratory judgment count;

j.    Finds that the Defendants must account for all current and former employees' improperly withheld compensation, as alleged herein, that the Defendants should be enjoined from dispersing said funds; and that the said funds should be placed into a constructive trust until further order of Court;

k.    Finds that the Defendants have been unjustly enriched by their practices and policies of not paying earned compensation which has been withheld, deducted, or otherwise not paid in the event it does not find violations of Illinois Wage Payment and Collections Act;

l.    Finds that the Defendants must pay all earned compensation previously withheld, deducted, or otherwise unpaid, with interest pursuant to Section 115/14 IWPCA;

m.    Requires that the Defendants must pay punitive damage for their willful and wanton conduct as alleged herein;

n.    Awards reasonable attorneys' fees and costs pursuant to 820 ILCS § 115/14(a); and

o.    Grants such other relief as this Court deems appropriate.

Respectfully submitted,

By:      *Julia Bikbova*

        Julia Bikbova, Plaintiffs' Attorney

Julia Bikbova
Attorney for Plaintiffs
666 Dundee Rd, Suite 1604
Northbrook, Illinois 60062
(847) 730 1800
ARDC# 6291400